IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
NORTHERN DIVISION

No. 2:24-CV-25-RJ

AMIT MANGLIK,

              Plaintiff/Claimant,

v.

FRANK BISIGNANO,
*Commissioner of Social Security*,

              Defendant.

O R D E R

This matter is before the court on the parties' briefs filed pursuant to the Supplemental Rules for Social Security Actions. [DE-12, -14]. Claimant Amit Manglik ("Claimant") filed this action pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3) seeking judicial review of the denial of his application for a period of disability and Disability Insurance Benefits ("DIB"). Claimant filed a reply brief, [DE-17], the time for filing further responsive briefing has expired, and the matter is ripe for adjudication. Having carefully reviewed the administrative record and the briefs submitted by the parties, the final decision of the Commissioner is affirmed.

## I. STATEMENT OF THE CASE

Claimant protectively filed an application for a period of disability and DIB on March 8, 2021, alleging disability beginning September 1, 2019. (R. 17, 198–204). His claim was denied initially and upon reconsideration. (R. 17, 78–104). A video hearing before an Administrative Law Judge ("ALJ") was held on June 6, 2023, at which Claimant, represented by counsel, and a vocational expert ("VE") appeared and testified. (R. 36–68). On November 2, 2023, the ALJ issued a decision denying Claimant's request for benefits. (R. 14–35). On March 26, 2024, the

Appeals Council denied Claimant's request for review. (R. 1–6). Claimant then filed a complaint in this court seeking review of the now-final administrative decision.

## II. STANDARD OF REVIEW

The scope of judicial review of a final agency decision regarding disability benefits under the Social Security Act ("Act"), 42 U.S.C. § 301 *et seq.*, is limited to determining whether substantial evidence supports the Commissioner's factual findings and whether the decision was reached through the application of the correct legal standards. *See Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987). "The findings of the Commissioner . . . as to any fact, if supported by substantial evidence, shall be conclusive . . . ." 42 U.S.C. § 405(g). Substantial evidence is "evidence which a reasoning mind would accept as sufficient to support a particular conclusion." *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966). While substantial evidence is not a "large or considerable amount of evidence," *Pierce v. Underwood*, 487 U.S. 552, 565 (1988), it is "more than a mere scintilla . . . and somewhat less than a preponderance." *Laws*, 368 F.2d at 642. "In reviewing for substantial evidence, [the court should not] undertake to re-weigh conflicting evidence, make credibility determinations, or substitute [its] judgment for that of the [Commissioner]." *Mastro v. Apfel*, 270 F.3d 171, 176 (4th Cir. 2001) (quoting *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 1996), *superseded by regulation on other grounds*, 20 C.F.R. § 416.927(d)(2)). Rather, in conducting the "substantial evidence" inquiry, the court's review is limited to whether the ALJ analyzed the relevant evidence and sufficiently explained his or her findings and rationale in crediting the evidence. *Sterling Smokeless Coal Co. v. Akers*, 131 F.3d 438, 439–40 (4th Cir. 1997).

## III. DISABILITY EVALUATION PROCESS

The disability determination is based on a five-step sequential evaluation process as set

2

forth in 20 C.F.R. § 404.1520, under which the ALJ is to evaluate a claim:

> The claimant (1) must not be engaged in "substantial gainful activity," i.e., currently working; and (2) must have a "severe" impairment that (3) meets or exceeds [in severity] the "listings" of specified impairments, or is otherwise incapacitating to the extent that the claimant does not possess the residual functional capacity to (4) perform . . . past work or (5) any other work.

*Albright v. Comm'r of the Soc. Sec. Admin.*, 174 F.3d 473, 475 n.2 (4th Cir. 1999). "If an applicant's claim fails at any step of the process, the ALJ need not advance to the subsequent steps." *Pass v. Chater*, 65 F.3d 1200, 1203 (4th Cir. 1995) (citation omitted). The burden of proof and production during the first four steps of the inquiry rests on the claimant. *Id.* At the fifth step, the burden shifts to the ALJ to show that other work exists in the national economy which the claimant can perform. *Id.*

When assessing the severity of mental impairments, the ALJ must do so in accordance with the "special technique" described in 20 C.F.R. § 404.1520a(b)–(c). This regulatory scheme identifies four broad functional areas in which the ALJ rates the degree of functional limitation resulting from a claimant's mental impairment(s): activities of daily living; social functioning; concentration, persistence, or pace; and episodes of decompensation. *Id.* § 404.1520a(c)(3). The ALJ is required to incorporate into his written decision pertinent findings and conclusions based on the "special technique." *Id.* § 404.1520a(e)(3).

## IV. ALJ'S FINDINGS

Applying the above-described sequential evaluation process, the ALJ found Claimant "not disabled" as defined in the Act. At step one, the ALJ found Claimant had not engaged in substantial gainful employment since the alleged onset date. (R. 19). Next, the ALJ determined Claimant had the severe impairments of migraines, degenerative joint disease, hypertension, intellectual disability, depression, and anxiety, and the non-severe impairments of anemia,

3

GERD, hernia, and secondary polycythemia. (R. 19–20). At step three, the ALJ concluded

Claimant's impairments were not severe enough, either individually or in combination, to meet

or medically equal one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1.

(R. 20–22). Applying the technique prescribed by the regulations, the ALJ found that Claimant's

mental impairments have resulted in moderate limitations in understanding, remembering, or

applying information; adapting or managing oneself; interacting with others; and concentrating,

persisting, or maintaining pace. *Id.* Prior to proceeding to step four, the ALJ assessed

Claimant's RFC, finding that he had the ability to perform light work[1] with the following

restrictions:

> he can occasionally lift, carry, push, and pull up to 20 pounds, frequently lift,
> carry, push, and pull up to 10 pounds as well as sit, stand, and walk about six
> hours in an eight-hour workday. He can frequently balance; stoop; kneel; crouch;
> and crawl. The claimant can frequently climb ramps/stairs and climb ladders,
> ropes, or scaffolds. He should avoid concentrated exposure to unprotected
> heights; moving machinery; and hazardous machinery. The claimant should avoid
> concentrated exposure to loud noises and vibrations. He can understand,
> remember, and carry out simple instructions. The claimant can occasionally
> interact with co-workers and supervisors. He can occasionally interact with the
> general public. The claimant can use judgment to make simple work-related
> decisions. He can occasionally deal with changes in a routine work setting.

(R. 22–28). In making this assessment, the ALJ found that Claimant's statements about his

limitations were not entirely consistent with the medical evidence and other evidence in the

record. (R. 27). At step four, the ALJ concluded Claimant did not have the RFC to perform the

requirements of his past relevant work as a deli kitchen helper. (R. 28). Nevertheless, at step

five, upon considering Claimant's age, education, work experience and RFC, the ALJ determined

---

[1] Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing
up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good
deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg
controls. To be considered capable of performing a full or wide range of light work, you must have the ability to do
substantially all these activities. If an individual can perform light work, he or she can also perform sedentary work,
unless there are additional limiting factors such as the loss of fine dexterity or the inability to sit for long periods of
time. 20 C.F.R. § 404.1567(b).

there are jobs that exist in significant numbers in the national economy that he can perform. (R. 29).

## V. DISCUSSION

Claimant argues that the ALJ erred in (1) evaluating Listing 12.05, Intellectual Disorder, and (2) evaluating the opinion of Dr. Chandi. Pl.'s Br. [DE-12] at 10–21; Pl.'s Reply [DE-17]. The Commissioner contends that substantial evidence supports the ALJ's evaluation of Listing 12.05 and Dr. Chandi's opinion. Def.'s Br. [DE-14] at 6–22.

Claimant testified that he is 48 years old and lives with his parents, he obtained a driver's license after twice taking the test without accommodations, and his primary language is Hindi. (R. 45–46, 48–50). Claimant obtained an associate's degree from the College of Albemarle and a business degree and unmanned aircraft/drone degree from Elizabeth City State University ("ECSU"), his college GPA was 2.4, he received additional time and sat alone in a different room as accommodations for test taking, he was unable to write a two-page report, someone assisted him with taking notes, and his father helped him complete his school work. (R. 46–49). At the time of the administrative hearing, Claimant had just started working full time as a van driver, transporting students on campus for the summer at ECSU, and he had previously performed this job on a part-time basis. (R. 50–52). Claimant had never worked full time before but had worked part time in the deli at Wal-mart for a couple of years, (R. 52–54), and he also worked as a dishwasher for four years and during the school year doing odd jobs, e.g., office cleaning, at ECSU where his father worked. (R. 54–56, 642).

During a 2014 psychological consultation, Claimant reported earning college degrees but experiencing difficulties with his academic studies, and he "expressed a strong desire to obtain a full-time job" and "confusion about why he was not hired for jobs after interviewing." (R. 413).

5

His mother similarly reported it took him six years to earn a college degree and he required "immense educational support from others," he was fired from Wal-mart for being nonproductive, and he was fired from a job working at the student counseling front desk at ECSU after students made fun of him and he became annoyed and shouted back at them. (R. 433, 573, 642). However, at a 2015 psychological evaluation Claimant reported his work history somewhat differently:

> The claimant tells me he currently works at Elizabeth City State University in the cafeteria as a dishwasher and this is seasonal work; he only works during the fall and spring semesters. He last worked accordingly last month there, and he started working there back in August of 2014. It is full-time work during the normal fall and spring semesters. He tells me he is performing his job duties adequately. Prior to that, he worked at Wal-Mart from 2006 through 2008, at night, doing overnight stocking and this job involved 30-40 hours a night. I asked why did he leave that job, and he indicated because he did not like working at night. He tells me he performed his job duties adequately and he had no problem getting along with other employees there. I asked him why he was applying for Disability, and he eventually admitted that it was his mother's idea and he also indicated he is not as fast as other individuals working.

(R. 456).

Claimant was referred by his primary care doctor to a psychologist, Dr. Applegate, to evaluate Claimant's depression, and she performed a consultative psychological examination on November 5, 2014. (R. 411–15). Dr. Applegate observed that Claimant was disoriented but cooperative, his speech was slow and impoverished, his thought processes were incongruent, his attitude was appropriate and friendly, his mood was euthymic, his affect was normal, and he was "only able to provide limited details about his history possibly reflecting a lack of insight into the nature of his learning disability." (R. 413). Psychometric testing indicated severe depressive symptoms, and some difficulty identifying and describing feelings, and he was diagnosed with Adjustment Disorder Depressed Mood and Learning Disorder, Not Otherwise Specified. (R.

413–14). Dr. Applegate recommended that Claimant take medications as prescribed, utilize a therapist or social worker "to assist in the treatment of his depression and adjustment to phase of life issues given his cognitive abilities," and explore vocational rehabilitation services that "may be appropriate in assisting this patient to gain more fulfilling or appropriate employment, as well as preparation for independent living as his parents age." (R. 414).

In follow up to Dr. Applegate's recommendations, Claimant saw a licensed social worker, James Kronlage, for evaluation on November 24, 2014. (R. 433–36). Claimant's mother explained that he had seizures at 9 months old and again at age 2, his speech was delayed, and he was considered a slow learner in school. (R. 433). Claimant described experiencing symptoms of generalized anxiety, including restlessness, difficulty concentrating, excessive worrying, and becoming easily fatigued, as well as ADHD symptoms such as inattentiveness, making careless mistakes, forgetfulness, difficulty with tasks that require sustained mental effort, and poor attention to details. (R. 433). On examination, Claimant presented as calm, flat, attentive, communicative, well groomed, and anxious; he demonstrated normal speech and mood, blunted affect, intact and logical associations, no signs of psychosis, and poor insight and social judgment; and his attention span was short, he was easily distracted, and his behavior was cooperative and attentive with no gross behavioral abnormalities. (R. 434–35). Claimant was diagnosed with Generalized Anxiety Disorder, and Kronlage concluded that Claimant's difficulties securing employment appeared related to his learning problems, although it was difficult to ascertain his intelligence level without seeing prior testing results, and borderline intellectual functioning needed to be ruled out; his history of anxiety may further impede his ability to retain information under stress; and he had symptoms of ADHD (inattentive type) that needed to be ruled out. (R. 435). Kronlage also formulated a treatment plan of therapy for

7

Claimant's cognitive impairment, which manifested in an inability to follow directions and the need for careful supervision. (R. 437).

Tests administered by Gregory Michael, a psychologist, indicated Claimant had a mild intellectual disability and a full-scale IQ of 53, although he noted that the results may slightly underestimate actual ability due to language and cultural factors. (R. 442–44). It was noted that Claimant worked slowly on tasks, often required instructions to be repeated several times, and was friendly, motivated, focused, and made appropriate eye contact. (R. 443). He had difficulty counting money and understanding what he read, and Dr. Michael opined that Claimant "would be unable to read and understand many training manuals or operational manuals," he was "weak in understanding the intent of what was being asked of him," he would "need help recognizing and solving unexpected problems in a workplace," and he was "limited in his working memory which will affect him in multitasking or performing sequenced instructions." *Id.* Claimant expressed that he would like to go back to Wal-Mart or perhaps work in an airport, and Dr. Michael suggested Claimant "would probably perform best in repetitive types of tasks with clear and consistent instructions" and he "may require extra time to complete what is asked of him." *Id.*

Claimant underwent a consultative psychological evaluation, related to his disability application, with a licensed clinical mental health counselor and Dr. Shiahna Dye, on January 28, 2022. (R. 544–48). It was noted that Claimant was a reliable source of information and had no difficulty presenting information in a coherent, consistent, and chronological manner. (R. 544). He was at that time working three hours Monday–Friday at ECSU's cafeteria preparing orders and cashiering. *Id.* Claimant admitted being easily distracted by extraneous stimuli but denied carelessness, forgetfulness, and other deficits. (R. 544–45). He reported daily activities of

8

reading the newspaper and watching television, completing ADLs without assistance, and being unable to manage money appropriately. (R. 545). Claimant's mental status examination was unremarkable, but his intellectual ability appeared to be in the "Extremely Low to Borderline" range of functioning, and he was diagnosed with Unspecified Neurodevelopment Disorder. (R. 545–47). Dr. Dye observed that Claimant's cognitive abilities were "inconsistent with his stated educational attainment" and noted a documented full-scale IQ of 53, but also opined it was possible that cultural and language barriers contributed to his current performance. (R. 547). Dr. Dye then provided the following opinion:

> While Mr. Manglik appears able to understand, retain and follow instructions to perform simple, routine and repetitive tasks, he might struggle to maintain concentration, persistence and pace for more complex tasks. He does not appear to be an emotionally fragile individual and is not likely to struggle with negotiating simple work-related stressors. There is no evidence to suggest that he would have difficulty interacting with peers and co-workers and responding appropriately to supervision. Mr. Manglik appears to be self-sufficient personally and socially and somewhat self-sufficient regarding his occupational endeavors. His self-sufficiency, mood and psychological functioning are likely to remain unchanged pending no new stressors.

(R. 547). Finally, Dr. Dye suggested that Claimant may need assistance to manage any awarded benefits. (R. 548).

Claimant was evaluated on August 24, 2022, by Dorothy Rosenke, PsyD. (R. 573–79). Claimant's mother, consistent with earlier evaluations, reported that he earned a college degree only with "the immense support of family and teachers," he had been unsuccessful in sustaining employment, and it was noted that he was "in the legal guardianship of his parents." (R. 573, 578). Intelligence testing indicated that Claimant was in the range of mild intellectual disability, and it was noted that he "did not always show comprehension as to what he was being asked to do" but did attempt to follow directions and to be compliant. (R. 575, 578). Dr. Rosenke

9

indicated Claimant may benefit from job training services and that he was likely to qualify for disability due to his intellectual disability. (R. 578–79).

## A. Listing 12.05, Intellectual Disorder

The Listings consist of impairments, organized by major body systems, that are deemed sufficiently severe to prevent a person from doing any gainful activity. 20 C.F.R. § 404.1525(a). Therefore, if a claimant's impairments meet or medically equal a listing, that fact alone establishes that the claimant is disabled. *Id.* § 404.1520(d). An impairment meets a listing if it satisfies all the specified medical criteria. *Sullivan v. Zebley*, 493 U.S. 521, 530 (1990). Even if an impairment does not meet the listing criteria, it may still satisfy the listing if the impairment medically equals the criteria. 20 C.F.R. § 404.1525(c)(5); S.S.R. 17-2p, 2017 WL 1105349 (Mar. 27, 2017). The burden of demonstrating that an impairment meets or equals a listing rests on the claimant. *Hall v. Harris*, 658 F.2d 260, 264 (4th Cir. 1981); *Shoulars v. Astrue*, 671 F. Supp.2d 801, 813 (E.D.N.C. 2009). When "there is at least conflicting evidence in the record" as to whether a claimant satisfies a listing, the ALJ must explain a determination that the claimant's impairment does not meet or exceed the listing. *Radford v. Colvin*, 734 F.3d 288, 295 (4th Cir. 2013). The ALJ cannot "summarily conclude" that a listing is not satisfied because "insufficient legal analysis makes it impossible for a reviewing court to evaluate whether substantial evidence supports the ALJ's findings." *Id.*

Listing 12.05B, at issue here, is met when a claimant demonstrates:

1. Significantly subaverage general intellectual functioning evidenced by . . .

      a. A full scale (or comparable) IQ score of 70 or below . . .; or

      b. A full scale (or comparable) IQ score of 71–75 accompanied by a verbal or performance IQ score (or comparable part score) of 70 or below; and

2. Significant deficits in adaptive functioning currently manifested by extreme limitation of one, or marked limitation of two, of the following areas of mental functioning:

> a. Understand, remember or apply information . . .; or
>
> b. Interact with others . . .; or
>
> c. Concentrate, persist, or maintain pace . . .; or
>
> d. Adapt or manage oneself . . .; and

3. The evidence about [claimant's] current intellectual and adaptive functioning and about the history of [claimant's] disorder demonstrates or supports the conclusion that the disorder began prior to [the claimant's] attainment of age 22.

20 C.F.R. § 404, subpt. P, app. 1, 12.05B; *see Ingram v. Kijakazi*, No. 1:22-CV-216, 2023 WL 2143198, at *6 (M.D.N.C. Jan. 30, 2023) (stating criteria for Listing 12.05), *report and recommendation adopted*, 2023 WL 2142784 (M.D.N.C. Feb. 21, 2023); *Harrison v. Berryhill*, No. 5:17-CV-255-FL, 2018 WL 3993393, at *4 (E.D.N.C. Aug. 21, 2018) (same). A "mild limitation" means functioning is "slightly limited"; a "moderate limitation" means functioning is "fair"; a "marked limitation" means functioning is "seriously limited"; and an "extreme limitation" means an inability to function. 20 C.F.R. § 404, subpt. P, app. 1, 12.00F.

The ALJ considered Listing 12.05B and concluded it was not met because Claimant had no more than moderate limitations in any area of adaptive functioning. (R. 22). Claimant, who has a full-scale IQ of 53, contends that the record demonstrates he has at least marked if not extreme limitations in the areas of understanding, remembering, or applying information; adapting or managing oneself; and concentrating, persisting, or maintaining pace, and that the ALJ ignored or mischaracterized, i.e., cherry-picked, evidence to find otherwise. Pl.'s Br. [DE-12] at 11–18.

11

### 1. Understanding, Remembering, or Applying Information

The functional area of understanding, remembering, or applying information "refers to the abilities to learn, recall, and use information to perform work activities." 20 C.F.R. § 404, subpt. P, app. 1, 12.00E.1. Some examples that illustrate this area of functioning include "following one- or two-step oral instructions to carry out a task," "asking and answering questions and providing explanations," "identifying and solving problems," and "using reason and judgment to make work-related decisions." *Id.*

In finding Claimant moderately limited in this area, the ALJ acknowledged that the record included an estimated borderline intellectual functioning but noted that Claimant was able to attend community college and a state university and to obtain a bachelor's degree, he attended a school for aviation management, and he was working at the time of the administrative hearing. (R. 20). Claimant contends the evidence relied on by the ALJ does not account for the fact that he received significant help to obtain a bachelor's degree, he worked at the university where his father was employed and was given seemingly significant accommodations, he otherwise had trouble keeping a job and was fired from Wal-mart for being nonproductive, and objective testing demonstrated extreme deficits in this area.[2] Pl.'s Br. [DE-12] at 13–16.

The ALJ thoroughly summarized Dr. Michael's opinion and acknowledged that it reported Claimant's full-scale IQ was 53 and that his academic skills ranged from kindergarten level in arithmetic to seventh grade level in word identification and spelling. (R. 24, 442). However, the ALJ also noted Dr. Michael's observation that test results may "slightly underestimate the claimant's actual abilities due to language and cultural factors" and that

---

[2] Much of the evidence cited by Claimant comes from the consultative psychological evaluations in the record, and the ALJ discussed them in detail when formulating the Claimant's RFC, (R. 24–28). Accordingly, the court considers both the ALJ's step 3 and RFC discussions in evaluating whether substantial evidence supports the ALJ's determination that Claimant's impairment failed to meet Listing 12.05B.

12

difficulties with language may have contributed to his performance. (R. 24–25, 442–43). The ALJ found Claimant's ability to attend college and obtain a degree and his most recent work as a van driver were inconsistent with an IQ of 53, and the ALJ did acknowledge that Claimant reportedly received "a lot of help from family" to obtain his educational degree. (R. 25).

Notwithstanding his low IQ and apparent learning disability, Claimant testified that he was able to work as a dish washer for four years and at Wal-mart for two years, and at the time of the administrative hearing, Claimant had been working part time driving a van on the ECSU campus and had just started performing that work full time. *See Brown v. Kijakazi*, No. 1:20-CV-1035, 2022 WL 2222683, at *5 (M.D.N.C. June 21, 2022) ("[C]ourts have countenanced an ALJ's consideration of a claimant's work history in evaluating the claimant's intellectual disability."), *report and recommendation adopted*, 2022 WL 3681719 (M.D.N.C. Aug. 25, 2022); *see also Shinaberry v. Saul*, 952 F.3d 113, 118, 122 (4th Cir. 2020) (no error in the ALJ's finding that claimant with borderline intellectual disability and 2.4 GPA in high school, requiring special education classes, who had a work history as a cashier and sales associate at Lowe's and as a school custodian and preventative maintenance technician, could perform simple, routine, repetitive tasks). The jobs of deli worker and van driver performed by Claimant were both classified by the VE as semi-skilled, (R. 64), and the ALJ limited Claimant to less sophisticated unskilled work that required Claimant to understand, remember, and apply only simple instructions, (R. 22–23), which is consistent with the opinions of Dr. Dye, (R. 547), and Drs. Grover and Strobel-Nuss, the state agency reviewers, (R. 87, 101), as to Claimant's ability. The ALJ specifically discussed Dr. Dye's evaluation and the test results indicating Claimant appeared to be in the extremely low to borderline range of functioning, but also noted Dr. Dye's findings that he "appears able to understand, retain and follow instructions to perform simple, routine and

13

repetitive tasks, he might struggle to maintain concentration, persistence and pace for more complex tasks," and that he "is not likely to struggle with negotiating simple work-related stressors." (R. 25–26, 547). The fact that Claimant was able to obtain a college degree, albeit over six years and with substantial assistance, was also fairly considered by the ALJ in finding Claimant no more than moderately limited in the ability to understand, remember, and apply information. *See Garibay v. Berryhill*, 733 F. App'x 908, 909 (9th Cir. 2018) (concluding the ALJ did not err by citing the claimant's ability to earn a college degree during his period of alleged disability when evaluating his testimony, where the ALJ acknowledged that the claimant experienced difficulties completing the program and the claimant's ability to earn his degree despite these difficulties served as grounds for discounting claim of total disability) (citation omitted). The ALJ did not cherry-pick the record, and it is not the court's role to re-weigh the evidence considered by the ALJ. *See Hancock v. Astrue*, 667 F.3d 470, 472 (4th Cir. 2012) (citation omitted). Accordingly, the court finds that substantial evidence supports the ALJ's conclusion that Claimant was no more than moderately limited in understanding, remembering, and applying information.

## 2. Concentrating, Persisting, or Maintaining Pace

The functional area of concentrating, persisting, or maintaining pace "refers to the abilities to focus attention on work activities and stay on task at a sustained rate." 20 C.F.R. § 404, subpt. P, app. 1, 12.00E.3. Some examples that illustrate this area of functioning include "initiating and performing a task that you understand and know how to do," "working at an appropriate and consistent pace," "completing tasks in a timely manner," "ignoring or avoiding distractions while working," and "working a full day without needing more than the allotted number or length of rest periods during the day." *Id.*

14

In finding Claimant moderately limited in this area, the ALJ acknowledged that the record indicated Claimant often worked slowly but was but was able to complete tasks, there was no evidence of any complaints regarding his ability to focus or pay attention, and his mental status examinations consistently showed he was alert and oriented times three with good insight and judgment. (R. 20–21). Claimant contends the evidence in the record contradicts these findings and demonstrates at least a marked limitation in this area. Pl.'s Mem. [DE-12] at 16–17.

Claimant points to the following record evidence to suggest the ALJ mischaracterized the record as to his ability to concentrate, persist, and maintain pace: Dr. Applegate's examination finding that he was disoriented, (R. 413); a therapist's notes that he exhibited poor attention to details and was easily distracted, (R. 433, 435); Dr. Michael's observation that he worked very slowly with pencil and paper visual tasks and opinion that he was limited in working memory that would affect his ability to multitask or perform sequenced instructions, (R. 442–43); and Dr. Rosenke's testing showing processing speed symbol search was in the 0.4 percentile and coding was in the 5th percentile, (R. 576).

Dr. Applegate's evaluation noting that Claimant appeared disoriented and evaluator Kronlage's observations that he exhibited poor attention to details and was easily distracted were from November 2014, (R. 413, 433, 435), nearly five years prior to the alleged onset date, and the ALJ cited more recent records indicating that Claimant was routinely found to be alert and oriented times three; by June 2019, his anxiety disorder was stable and non-progressive; by February 2021, he denied anxiety, depression, or problems concentrating; and by November 2021, his mental status remained unchanged, i.e., he was alert and oriented with appropriate affect and demeanor and good insight and judgment. (R. 24, 464–95, 511–31). The ALJ acknowledged Dr. Michael's observation that Claimant worked slowly, but also that he was able

15

to focus on tasks. (R. 25, 442–43). While Claimant notes that Dr. Michael indicated his limited working memory would affect him in multitasking or performing sequenced instructions, (R. 443), the RFC accounts for this deficit by limiting Claimant to remembering only simple instructions, making simple work-related decisions, and dealing with occasional changes in a routine work setting, (R. 22–23). The ALJ also noted Dr. Dye's conclusion that Claimant may struggle to maintain concentration, persistence and pace for more complex tasks, but appeared able to perform simple, routine, and repetitive tasks. (R. 26, 547). While the ALJ did not specifically mention Dr. Rosenke's testing showing processing speed symbol search was in the 0.4 percentile and coding was in the 5th percentile, (R. 576), "there is no rigid requirement that the ALJ specifically refer to every piece of evidence in his decision," *Reid v. Comm'r of Soc. Sec. Admin.*, 769 F.3d 861, 865 (4th Cir. 2014) (*quoting Dyer v. Barnhart*, 395 F.3d 1206, 1211 (11th Cir. 2005)), and the ALJ did acknowledge that Dr. Rosenke's testing indicated Claimant's cognitive development was in the range of Intellectual Disability, Mild, (R. 26), which evidences the ALJ's consideration of the test results. Accordingly, the court finds that the ALJ did not cherry-pick or mischaracterize the evidence, and the conclusion that Claimant was moderately limited in concentrating, persisting, or maintaining pace is supported by substantial evidence.

### 3. Adapting or Managing Oneself

The functional area of adapting or managing oneself "refers to the abilities to regulate emotions, control behavior, and maintain well-being in a work setting." 20 C.F.R. § 404, subpt. P, app. 1, 12.00E.4. Some examples that illustrate this area of functioning include "responding to demands," "adapting to changes," "distinguishing between acceptable and unacceptable work performance," "setting realistic goals," and "maintaining personal hygiene and attire appropriate to a work setting." *Id.*

16

In finding Claimant moderately limited in this area, the ALJ stated that Claimant's mother indicated that he was able to take care of his own personal care, drive, walk, go to class, run a few errands, and do laundry and wash dishes, all without any special reminders; his hobbies included watching television, watching movies, and listening to music; and vocational rehabilitation noted that he may benefit from job training. (R. 21). Claimant contends the evidence in the record contradicts these findings and demonstrates at least a marked and likely extreme limitation in this area. Pl.'s Br. [DE-12] at 17–18.

Claimant relies on the following evidence to support the contention that he is markedly or extremely limited in the ability to adapt or manage himself: the fact that Claimant was under the legal guardianship of his parents and that Dr. Rosenke recommended they make plans for his guardianship in the event of their death, (R. 579); Dr. Rosenke's recommendation that Claimant receive support services, including community living and support, a community navigator, community networking, crisis services, day supports, respite, natural supports education, residential supports, supported living, and supported employment, *id.*; extremely low behavioral assessment results in the areas of communication, functional academics, self-direction, leisure, social, community use, home living, health and safety, and self-care, (R. 576); and Dr. Michael's observation that Claimant "showed very little understanding of adult social situations and he did not attend well to visual details" and that he would "need help recognizing and solving unexpected problems in a workplace." (R. 442–43). Claimant also takes issue with the ALJ's finding that Claimant can take care of his personal needs, citing his report that he needed help combing his hair and shaving properly and tying his shoelaces, he was not comfortable using kitchen tools, he required instructions as to what clothes to put in the laundry, and his father handled his bank account. (R. 300–02).

17

The ALJ considered Dr. Rosenke's observation that Claimant was under the guardianship of his parents, the testing results indicating Claimant had mild intellectual disability, and that there were recommended services Claimant could receive due to his mild intellectual disability. (R. 26). The ALJ specifically recounted Dr. Michael's observation that Claimant "showed very little understanding of adult social situations and he did not attend well to visual details," (R. 25), and the ALJ included a limitation in the RFC to only occasionally deal with changes in a routine work setting, (R. 23), which would account for Claimant's need for help recognizing and solving unexpected problems in the workplace. With respect to Claimant's evidence that he required assistance with some personal care, the fact that Claimant can "point to other evidence that supports h[is] position does not render the ALJ's decision unsupported," *Allen v. Kijakazi*, No. 2:20-CV-89-M, 2022 WL 3655488, at *9 (E.D.N.C. Aug. 4, 2022) (quoting *Lilley v. Saul*, No. 4:19-CV-93-RJ, 2020 WL 3884429, at *11 (E.D.N.C. July 9, 2020), *report and recommendation adopted*, 2022 WL 3655217 (E.D.N.C. Aug. 24, 2022), and the ALJ cited Dr. Dye's opinion that Claimant "appears to be self-sufficient personally and socially and somewhat self-sufficient regarding his occupational endeavors," (R. 26, 547). The ALJ also noted Dr. Dye's finding that Claimant did "not appear to be an emotionally fragile individual and [wa]s not likely to struggle with negotiating simple work-related stressors," (R. 26, 547), which further supports the ALJ's finding that Claimant was only moderately limited in the ability to "regulate emotions, control behavior, and maintain well-being in a work setting," 20 C.F.R. § 404, subpt. P, app. 1, 12.00E.4. Finally, the state agency reviewers, whose opinions the ALJ found to be persuasive, determined Claimant was only moderately limited in the ability to adapt or manage oneself. (R. 28, 82, 97). Accordingly, the court finds that the ALJ did not selectively cite the record, and the conclusion that Claimant was only moderately limited in the area of adapting and managing oneself is

18

supported by substantial evidence.

## B. Dr. Chandi's Opinion

When assessing a claimant's RFC, the ALJ must consider the opinion evidence. 20 C.F.R. § 404.1545(a)(3). The applicable regulation provides that the ALJ "will not defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative medical finding(s), including those from [the claimant's] medical sources." 20 C.F.R. § 404.1520c(a). Instead, the ALJ must consider the persuasiveness of medical opinions using five factors: (1) supportability, meaning that "[t]he more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion(s) . . . the more persuasive the medical opinions or prior administrative medical finding(s) will be"; (2) consistency, meaning that the more consistent an opinion is with other evidence in the record, the more persuasive the medical opinion will be; (3) the medical source's relationship with the claimant, which considers the length of the treating relationship, frequency of examinations, purpose of the treating relationship, extent of the treatment relationship, and whether the medical source examined the claimant; (4) specialization, meaning that "a medical source who has received advanced education and training to become a specialist may be more persuasive"; and (5) "other factors that tend to support or contradict a medical opinion." *Id.* § 404.1520c(c)(1)–(5). The most important factors are supportability and consistency. *Id.* § 404.1520c(a).

Claimant's long-time treating physician, Dr. Chandi, completed a medical evaluation form dated April 30, 2023. (R. 637–39). As relevant here, Dr. Chandi indicated Claimant suffered from knee pain that did not affect his ability to focus and stay on task but would require extra rest breaks of more than one hour total during the workday and that limited him to three

19

hours of standing or walking in a workday. (R. 637–38). The ALJ summarized Dr. Chandi's opinion and found it to be unpersuasive because it was inconsistent with the preponderance of the evidence. (R. 26–27). Claimant argues that the ALJ failed to discuss the supportability of Dr. Chandi's opinion and cited no evidence to support the consistency analysis, which frustrates meaningful review. Pl.'s Br. [DE-12] at 19–21. Claimant also asserts that PA Nelson's opinion that Claimant had severe limitations with standing and walking due to knee pain, coupled with examination findings of abnormal tandem walking, inability to hop on one foot, and pain with range of motion, are consistent with Dr. Chandi's opinion that Claimant's ability to walk or stand was more limited than the ALJ found. *Id.* at 20.

While the court would agree that the ALJ's two-sentence explanation finding Dr. Chandi's opinion unpersuasive is alone insufficient, *Radford*, 734 F.3d at 295 ("The record should include a discussion of which evidence the ALJ found credible and why, and specific application of the pertinent legal requirements to the record evidence.") (citing *Hines v. Bowen,* 872 F.2d 56, 59 (4th Cir. 1989)), the ALJ's reasoning is apparent from the balance of the RFC discussion and is supported by substantial evidence in the record, rendering any error harmless. *See Boulden v. O'Malley*, No. 24-1414, 2025 WL 48337, at *4 (4th Cir. Jan. 8, 2025) (rejecting argument that ALJ's supportability and consistency analysis was insufficient because he cited only one exhibit out of a 3,600-page record, where the court's review of the record indicated normal examinations in treatment notes, and "the ALJ *did* cite significant other record evidence elsewhere in his opinion, making clear he reviewed the record closely"); *Webb v. Kijakazi*, No. 1:20-CV-714, 2021 WL 5206498, at *13 (M.D.N.C. Nov. 9, 2021) (finding any error by the ALJ in failing to expressly discuss consistency of medical opinion was harmless where the plaintiff failed to show that "remand for an express discussion of the consistency of Dr. Bolz's opinion

20

with the remainder of the record would lead to a favorable outcome in his case."), *report and recommendation adopted*, 2021 WL 5834407 (M.D.N.C. Dec. 9, 2021).

After discussing Dr. Chandi's opinion, the ALJ summarized the RFC findings and explained that the record evidence showed,

> [i]n terms of his degenerative joint disease, his physical examinations have consistently shown 5/5 strength throughout with a normal gait and a normal range of motion in all muscle groups and he testified that his knee pain was something that he could handle, and he was currently working as a van driver.

(R. 27). In discussing Claimant's treatment records, the ALJ specifically noted Dr. Chandi's treatment notes in September 2019 showing the physical examination within normal limits, and in November 2021 showing normal gait with 5/5 strength and normal range of motion of all major muscle groups. (R. 23, 485–86, 511–13). Additionally, Dr. Chandi's treatment notes from March 2019 to June 2021 did not reflect any complaints of knee pain and/or stated Claimant was negative for arthralgias, back pain, joint stiffness, and limb pain; had normal gait, tone, and strength; had 5/5 strength in all major muscle groups; had normal range of motion of all major muscle groups; had no laxity or subluxation of any joints; and had no masses, effusions, misalignment, crepitus, or tenderness in major joints. (R. 464–93, 527–31).

Claimant first reported knee pain to Dr. Chandi in July 2021, (R. 525–26), was sent for x-rays then referred to orthopedics the following week, (R. 523–24), and was noted to be receiving physical therapy the following month, (R. 521).[3]  On December 4, 2021, Claimant attended a consultative examination with PA Nelson, who noted that Claimant reported being unable to stand for longer than 15–20 minutes at a time due to knee pain and that the pain was constant, improved with resting and sitting, and worsened with standing, and Nelson found Claimant was

---

[3] The administrative record does not appear to contain orthopedic or physical therapy treatment notes.

21

severely limited in standing and walking due to knee pain.[4]  (R. 533–42).  In March 2022, Claimant was seen by Dr. Chandi for a possible knee injection, (R. 554), and in July 2022, Claimant received a steroid injection in his right knee and was referred to physical therapy, (R. 556–57).  However, when Claimant subsequently saw Dr. Chandi in October 2022, December 2022, and March 2023, there was no mention of knee pain in the treatment notes.  (R. 626–34).  Although the ALJ inexplicably did not specifically discuss these treatment notes, which seem particularly relevant, the ALJ generally referenced consistently normal physical examination findings, showing the treatment notes were considered.  (R. 27).  The ALJ did cite Claimant's statement that his knee pain was something that he could handle,[5] *id.*, and Claimant testified that he did not take medication for his knee pain, (R. 60–61).  *See Paulman v. Berryhill*, No. 1:17-CV-154-DSC, 2018 WL 1629120, at \*3 (W.D.N.C. Apr. 4, 2018) (finding substantial evidence supported the ALJ's conclusion that plaintiff's symptoms were not as disabling as alleged where plaintiff was not taking any medication or undergoing treatment for his ADHD or alleged anxiety symptoms).

Despite the ALJ's minimal discussion of Dr. Chandi's opinion, it is apparent from the

---

[4] The ALJ determined Nelson's opinion was partially persuasive but that the limitations as to standing and walking,

> appear to be overestimated in light of the overall medical evidence including this examination where he was noted to have a normal, reciprocal gait pattern along with being able to walk on his heels and toes. He was also able to squat and rise from that position with ease as well as rise from a sitting position without assistance and had difficulty getting up and down from the examination table, though right sided strength was 4/5.

(R. 24).  Claimant did not challenge the ALJ's evaluation of Nelson's opinion.

[5] Claimant asserts that it is unclear where the ALJ found that he "could handle" his knee pain.  Pl.'s Reply [DE-17] at 6.  The ALJ attributed this statement to Claimant's testimony.  (R. 27).  At the June 2023 administrative hearing, which was conducted by online video, Claimant testified that he had knee pain every day.  (R. 60).  The ALJ then asked how that affected Claimant when he was working, and while the transcript states the response was in "Inaudible," *id.*, Claimant's response was the likely source of this statement considering the context of the exchange and the fact that Claimant next denied taking any medication for his knee pain, (R. 61).  Even excluding this statement, there is other evidence in the record, discussed herein, sufficient to support the ALJ's evaluation of Dr. Chandi's opinion.

22

ALJ's decision that he discounted the opinion based on Claimant's testimony at the administrative hearing and contradictory evidence in the medical records indicating Claimant was no longer receiving treatment or taking medication for his knee pain. *See Keene v. Berryhill*, 732 F. App'x 174, 177 (4th Cir. 2018) (finding no error where the ALJ's justification, "albeit somewhat sparse," was sufficient to demonstrate the ALJ performed an adequate review of the whole record and that the decision is supported by substantial evidence); *Dunn v. Colvin*, 607 F. App'x 264, 276 (4th Cir. 2015) ("[T]he fact that the ALJ could have offered a more thorough explanation for his decision does not change our conclusion that substantial evidence in the record supports that decision."). It is, thus, inconceivable that the ALJ would reach a different decision on remand. *See Daniel G. B. v. O'Malley*, No. 1:23-CV-760, 2024 WL 2157831, at *7 (M.D.N.C. May 14, 2024) (finding failure to evaluate the persuasiveness of a medical opinion was harmless where, among other things, the ALJ credited other evidence in the record that undermined the opinion) (citing *Fisher v. Bowen*, 869 F.2d 1055, 1057 (7th Cir. 1989) (observing that "[n]o principle of administrative law or common sense requires us to remand a case in quest of a perfect opinion unless there is reason to believe that the remand might lead to a different result")), *report and recommendation adopted sub nom. Bowden v. O'Malley*, 2024 WL 3203195 (M.D.N.C. June 26, 2024); *Dyrda v. Colvin*, 47 F. Supp. 3d 318, 326 (M.D.N.C. 2014) ("[T]he Fourth Circuit has embraced harmless error review of administrative decisions, such that, if an ALJ erroneously considered or failed to consider some evidence, remand is not appropriate unless the claimant was prejudiced.") (citations omitted). Accordingly, because the court can trace the ALJ's reasoning and substantial evidence supports the decision, any error in the evaluation of Dr. Chandi's opinion is harmless.

## VI. CONCLUSION

For the reasons stated above, the final decision of the Commissioner is affirmed.

So ordered, the __2__ day of June 2025.

Robert B. Jones, Jr.
United States Magistrate Judge

24